# UNITED STATES BANKRUPTCY COURT

EASTER DISTRICT OF VIRGINIA
NORFOLK DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| JUNE LAURIE ROUNTREE, | ) | |
| | ) | Case No. 01-21480-SCS |
| *Debtor.* | ) | |
| | ) | |
| JUNE LAURIE ROUNTREE, | ) | |
| | ) | APN 09-07057-SCS |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PAMELA NUNNERY, | ) | |
| PAUL KLEIN, | ) | |
| | ) | Chapter 7 |
| *Defendants.* | ) | |

## MEMORANDUM OPINION

On October 25, 2010, this Court conducted a hearing on the Motion for Summary Judgment of the Plaintiff, June Laurie Rountree ("Rountree" or the "Plaintiff"), against the Defendants, Pamela Nunnery ("Nunnery") and Paul Klein ("Klein," and together with Nunnery, "Nunnery and Klein" or the "Defendants"). At issue is whether Nunnery and Klein have violated § 524 of the Bankruptcy Code[1] by their continuation of a state court proceeding pending in the State of North Carolina against Rountree and others. At the conclusion of the hearing, the Court took the matter under advisement. This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157(b) and 1334(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a).

---

[1]     "Bankruptcy Code" shall mean Title 11 of the United States Code. Unless otherwise noted, statutes cited are those of the Bankruptcy Code.

This Memorandum Opinion constitutes the Court's conclusions of law.

## I.  PROCEDURAL HISTORY

### A.  The Complaint and the Answer

On May 22, 2009, Rountree filed her complaint, asking this Court to find that Nunnery and Klein have violated § 524 of the Bankruptcy Code by their continuation of a state court proceeding pending in North Carolina against Rountree and others (the "Complaint").  The Complaint, among other things, alleges Rountree was discharged of any debts owed to Nunnery by reason of her discharge received in the underlying bankruptcy case on April 25, 2002 (the "Discharge Order").  The parties fully litigated the issue of dischargeability prior to the filing of the instant Complaint:  Nunnery initiated a complaint against Rountree seeking a determination that Rountree's indebtedness to Nunnery was nondischargeable under § 523(a) of the Bankruptcy Code (the "§ 523 Proceeding").  The § 523 Proceeding ended when the United States Court of Appeals for the Fourth Circuit ruled that the indebtedness of Rountree to Nunnery was discharged.  *Nunnery v. Rountree* (*In re Rountree*), 478 F.3d 215, 222–23 (4th Cir. 2007) (concluding that § 523(a)(2)(A) of the Bankruptcy Code "is not . . . the appropriate exception to discharge in bankruptcy for Nunnery's judgment claim against Rountree" and affirming the final order of the United States District Court for the Eastern District of Virginia, which found the debt to be dischargeable).[2]

The Complaint further alleges (i) that on September 24, 2003, the Chapter 7 Trustee (the "Trustee") filed a complaint in this Court against Rountree, alleging a fraudulent conveyance of

---

[2]     For a more detailed history and description of the lengthy proceedings concerning the dischargeability of the indebtedness of Rountree to Nunnery, see *Nunnery v. Rountree* (*In re Rountree*), 330 B.R. 166 (E.D. Va. 2004), and *Nunnery v. Rountree* (*In re Rountree*), 478 F.3d 215 (4th Cir. 2007).

certain real property located in North Carolina, and (ii) that on October 23, 2003, Nunnery filed

suit in Superior Court in Randolph County, North Carolina, alleging the same cause of action as

the Trustee in his complaint (the "N.C. Fraudulent Transfer Proceeding").   Complaint ¶¶ 9–10.

This Court enjoined the prosecution of the N.C. Fraudulent Transfer Proceeding pending the

final resolution of the § 523 Proceeding. *Id.* ¶¶ 11–12.  On July 26, 2005, shortly after this Court

enjoined the prosecution of the N.C. Fraudulent Transfer Proceeding, the state court declared the

N.C. Fraudulent Transfer Proceeding inactive and closed the proceeding without prejudice to be

reopened on proper motion. *Id.* ¶ 13.  On February 27, 2007, the United States Court of Appeals

for the Fourth Circuit issued its decision and Nunnery's claim was declared dischargeable. *Id.*

¶ 14.

The Complaint additionally alleges that in January 2009, Nunnery moved for the N.C.

Fraudulent Transfer Proceeding to be "put back" on the state court trial calendar, and trial was set

for June 15, 2009. *Id.* ¶ 16.  Rountree alleges that on March 12, 2009, counsel for Rountree

wrote to counsel for Nunnery requesting that Nunnery dismiss the N.C. Fraudulent Transfer

Proceeding, which Nunnery declined to so do. *Id.* ¶¶ 21–22.  Finally, Rountree contends that

Nunnery, by continuing the N.C. Fraudulent Transfer Proceeding, is willfully and blatantly

violating the provisions of § 524 of the Bankruptcy Code. *Id.* ¶¶ 24–28.[3]  Rountree prays that

this Court (i) enjoin the further prosecution of the N.C. Fraudulent Transfer Proceeding by

Nunnery against Rountree and the other defendants named therein, Laurin DeWolf and April

DeWolf (collectively, "the DeWolfs"), (ii) find Nunnery and Klein in contempt of this Court, and

---

[3]        By way of the prayer, the Complaint seeks redress for Klein's alleged willful violation as well.  Complaint at 4 ("[T]he Debtor [Rountree] prays . . . that this Court hold Pamela Nunnery and Paul Klein in contempt for their willful violations of this Court's Discharge Order, and the injunctive provisions of 11 U.S.C. § 524, and award sanctions, including an award of damages, and an award of attorney's fees against them.").

(iii) award sanctions against each of them, including damages and attorneys' fees.[4]

On June 30, 2009, Nunnery and Klein filed a joint Motion to Dismiss and Answer to Amended Complaint (the "Answer").  In their Answer, Nunnery and Klein defend the Complaint principally by asserting they committed no willful violations of the discharge order here and that the N.C. Fraudulent Transfer Proceeding is a "suit arising from tortious conduct independent of that which gave rise to the scheduled claim, and that claim has not been discharged, nor had it ever been scheduled."  Answer at 6.[5]

### B.  The Motion for Summary Judgment

Rountree filed the Motion for Summary Judgment on October 5, 2010.  The Motion for Summary Judgment contains forty-seven (47) assertions of fact and law that Rountree believes entitles her to entry of judgment against Nunnery and Klein.  The Motion for Summary Judgment initially asserts the circumstances of Nunnery obtaining judgment against Rountree, the filing of the bankruptcy here, and the determination of the discharge of this judgment. Motion for Summary Judgment ¶¶ 1–13.[6]  Rountree then asserts circumstances relating to her bankruptcy proceeding, stating (i) that Nunnery does not have a judgment lien recorded or

---

[4]    Rountree filed an Amended Complaint on May 27, 2009 (the "Amended Complaint"). The Amended Complaint contains no material differences from the allegations of the Complaint. References to the Complaint shall include the Amended Complaint.

[5]    The Answer also asserted that the Complaint failed to state a claim for which relief may be granted, and, subsequent to the filing of the Answer, on July 15, 2009, Nunnery and Klein filed a combined "Motion to Strike[,] Motion to Dismiss and Answer to Amended Complaint" (the "Motion to Strike and Motion to Dismiss").  This Court held a hearing on the Motion to Strike and Motion to Dismiss, each of which the Court denied by orders entered on February 26, 2010.

[6]    The specific factual assertions of Rountree in the Motion for Summary Judgment have been omitted here as these factual assertions, as opposed to the legal assertions of Rountree, are uncontested by Nunnery and Klein.  *Infra* Part I.C.

4

perfected in Currituck County, North Carolina; (ii) that Nunnery filed her unsecured proof of

claim in Rountree's bankruptcy on March 21, 2002; (iii) that the basis for Nunnery's claim was

"invasion of privacy; fraud; unfair and deceptive trade practices" (the "Privacy Claims"); and

(iv) that the Trustee paid a bankruptcy distribution of $1,475.26 to Nunnery on her claim.  *Id.*

¶¶ 14–16.  Rountree then recites the assertion of a claim by the Trustee in this bankruptcy:  "On

September 24, 2003, the Chapter 7 Trustee filed an adversary proceeding against Rountree, Mr.

Laurin DeWolf, and Mrs. April DeWolf entitled 'Complaint to Avoid Transfer and Recover

Value of Property' with regard to the same alleged fraudulent conveyance that is the subject of

the pending [N.C. Fraudulent Transfer Proceeding]," *id.* ¶ 18; "[t]he Adversary Proceeding filed

by the Chapter 7 Trustee was later dismissed by Order entered July 14, 2004," *id.* ¶ 19.

Rountree then turns to the circumstances of the N.C. Fraudulent Transfer Proceeding,

asserting the following:

> 20.    On October 31, 2003, just over one month after the Trustee filed his Complaint to Avoid Transfer, and without Bankruptcy Court approval, Nunnery filed suit against the Debtor, Mr. Laurin DeWolf, and Mrs. April DeWolf in Randolph County Superior Court, North Carolina, alleging the same fraudulent conveyance (the "Randolph County Claim" or "N.C. Fraudulent Conveyance Claim").  (See Defendant's Response No. 11 dated September 2, 2010, to Plaintiff's Second Request for Admissions, attached as Exhibit A).

> 21.    The N.C. Fraudulent Conveyance Claim is currently pending in Randolph County Superior Court.  (See Defendant's Response No. 11 dated September 2, 2010 to Plaintiff's Second Request for Admissions, attached as Exhibit A).

> 22.    The N.C. Fraudulent Conveyance Claim was a new, separate right asserted against the Debtor by Nunnery after both the Debtor's filing of her bankruptcy petition and her discharge. (See Defendants' Response No. 8 in Defendants' Opposition to Motion to Reopen dated April 6, 2009, attached as Exhibit K).

5

23.    Nunnery's N.C. Fraudulent Conveyance Claim is not an action on a debt.  (See Defendant's Response No. 23, Sec. IV, p. 11, of Defendants' Memorandum in Support of Motions to Dismiss and Summary Judgment dated January 26, 2010, attached as Exhibit F).

24.    Nunnery's N.C. Fraudulent Conveyance Claim seeks to "recover for the statutory wrong of a fraudulent conveyance."  (See Defendants' Responses Nos. 23 and 24, Sec. IV, p. 11, of Defendants' Memorandum in Support of Motions to Dismiss and Summary Judgment dated January 26, 2010, attached as Exhibit F).

25.    Nunnery's N.C. Fraudulent Conveyance Claim prays that the sale of the Currituck, N.C. property be set aside "to the extent that the proceeds of such sale are to be deposited by recipient of such proceeds into the treasury of this [N.C.] court to be held *for distribution to the creditors of Defendant Rountree, including Plaintiff.*"  (See N.C. Fraudulent Conveyance Complaint of Nunnery attached, produced in response to Plaintiff's First Request for Productions, attached as Exhibit L, emphasis added).

*Id.* ¶¶ 20–25.

Exhibit L of the Motion for Summary Judgment is Nunnery's Response to Rountree's First Request for Production of Documents.  Nunnery has included in the response a copy of her complaint from the N.C. Fraudulent Transfer Proceeding (the "N.C. Complaint").  As follows, the allegations contained in the N.C. Complaint describe (i) the judgment on her prepetition Privacy Claims and (ii) the transactions between Rountree and the DeWolfs as transactions made for the purpose of defrauding Rountree's creditors:

5.    On or about July 11, 1997, . . . [Nunnery] commenced what eventually became a series of lawsuits (hereinafter "the Privacy Claim") against Defendant Rountree, alleging, among other things, invasion of privacy, intentional and negligent infliction of emotional distress, fraud, unfair and deceptive trade practices, and other torts.

. . . .

6

7.      On September 27, 2002, Judgment was entered in favor of [Nunnery] herein, and against Defendant Rountree herein in the Privacy Claim in the sum of $320,000.00 plus interest and costs.

8.      No portion of the aforementioned Judgment has been paid, and no appeal therefrom has been taken.

9.      Upon information and belief, on July 11, 1997, [Rountree] was, along with [Laurin DeWolf], the title owner of . . . [real property in] Currituck County, North Carolina . . . .

10.     The [Currituck] propert[y] described in the preceding Paragraph [¶ 9] [was] purchased with funds of [Rountree], and at no time was the title interest of [Laurin DeWolf] based upon his financial participation in the purchase or improvement of either parcel.

11.     The inclusion of [Laurin DeWolf] by [Rountree] on the title to one or both of the properties described hereinabove was for purposes of defrauding creditors, including [Nunnery].

12.     Following the rendering of the jury verdict in the Privacy Claim that resulted in the Judgment referred to hereinabove, [Rountree] executed, in favor of [Laurin DeWolf], and recorded, quitclaim deeds in an attempt to make it appear as if she had previously divested herself of her interest in each of the properties referred to hereinabove.

13.     Although the date on the quitclaim deed to the Currituck property purports to be January 28, 1999, it was actually executed at a later time.  Even if the deeds as referred to in the preceding paragraph were executed as early as January 28, 1999, it was executed at a time when the Privacy Claim was in suit, and the execution of the deed was for purposes of defrauding the creditors of [Rountree], and others, including [Nunnery].

14.     At some point unknown to [Nunnery], [Laurin DeWolf] deeded an interest in the properties aforementioned to [April DeWolf].

15.     On or about November 22, 2002, the Currituck property was transferred by [Laurin DeWolf and April DeWolf] to one Rachel Grout and one Stephen Grout.

. . . .

7

17.     The delay in recording the purported deed to the Currituck property, if there were such a delay, and the sale to a *bona fide* purchaser for value in November, 2002 were done by [Laurin DeWolf and April DeWolf] to defraud the creditors of Rountree, and others, including [Nunnery], by thwarting the possibility of reversing the quitclaim deed.

. . . .

19.     This action arises out of a claim to recover benefits derived by the Defendants [Rountree, Laurin DeWolf, and April DeWolf] through the use, ownership, control or possession and transfer by them of tangible property situated within the State of North Carolina.

. . . .

21.     Rountree did not receive value from Laurin [DeWolf] when Laurin [DeWolf] was first given an interest in the Currituck property.

. . . .

23.     Laurin [DeWolf] did not provide value in exchange for the quitclaim deed on the Currituck property executed and recorded by Rountree.

. . . .

25.     The inclusion of [Laurin DeWolf] on the original deed to the Currituck property was a fraudulent transfer in that (a) it was made with intent to hinder, delay or defraud creditors of Rountree; and (b) it was made without receiving a reasonably equivalent value in exchange for it, while [Rountree] was engaged or about to be engaged in litigation with [Nunnery], and her remaining assets were unreasonably small in relation to the amount of a Judgment she could incur in the Privacy Claim.

. . . .

27.     The execution of the quitclaim deed to the Currituck property was a fraudulent transfer in that (a) it was made with intent to hinder, delay or defraud creditors of Rountree; and (b) it was made without receiving a reasonably equivalent value in exchange for it, while [Rountree] was engaged or about to be engaged in litigation with [Nunnery], and her remaining assets

8

were unreasonably small in relation to the amount of a Judgment she could incur in the Privacy Claim.

. . . .

29.     At the time of the inclusion of [Laurin DeWolf] on the original deed to the Currituck property, it was made to an insider for no reasonably equivalent value in exchange, and Rountree was insolvent at that time or became insolvent as a result of that transfer or obligation.

. . . .

31.     At the time of the execution of the quitclaim deed to the Currituck property, it was made to an insider for no reasonably equivalent value in exchange, and Rountree was insolvent at that time or became insolvent as a result of that transfer or obligation.

. . . .

33.     The transfer to *bona fide* purchasers for value by [Laurin DeWolf and April DeWolf] of the Currituck property were for purposes of defrauding [Nunnery] and frustrating her remedies in collecting the Judgment referred to hereinabove.

34.     The fraudulent activity described hereinabove was part of an ongoing effort on the part of [Rountree], assisted by [Laurin DeWolf], which had included (a) the use of delaying tactics in the Privacy Claim, (b) the filing of a Bankruptcy petition to stay the Privacy Claim, and (c) the utterance of false statements about her assets in the bankruptcy matter, all in an effort to avoid her obligations to [Nunnery].

35.     On account of the foregoing, [Nunnery] is entitled to monetary relief in a sum in excess of $10,000.00 in compensatory damages and a sum in excess of $10,000.00 in punitive damages from each of the Defendants [Rountree, Laurin DeWolf, and April DeWolf], and equitable relief as described hereinbelow.

WHEREFORE, having fully described her claim against the Defendants [Rountree, Laurin DeWolf, and April DeWolf], [Nunnery] demands Judgment:

1.     for compensatory damages in a sum in excess of $10,000.00;

9

2.      setting aside the quitclaim deed transactions hereinabove referred to . . . ;

3.      setting aside the sale of the Currituck property to the bonafide purchasers for value to the extent that the proceeds of such sale are to be deposited by the recipient of such proceeds into the treasury of this Court to be held for distribution to the creditors of [Rountree], including [Nunnery];

4.      for punitive damages in a sum to be decided by the jury herein;

5.      for an Order awarding the costs, including prejudgment interest, to [Nunnery]; and

6.      granting such other, further and different relief as may be deemed just and proper.

*Id.* at Exh. L.[7]

Rountree, in the Motion for Summary Judgment, thereafter describes the transfer that is the subject of the N.C. Fraudulent Transfer Proceeding:

27.      The conveyance of the Currituck, N.C. real estate, the subject of the N.C. Fraudulent Conveyance Claim, occurred well after the Debtor's bankruptcy filing.  (See Defendant Klein's letter dated March 9, 2009 to Charles R. Rabon, Jr., Esq., produced in response to Plaintiff's First Request for Production, attached as Exhibit N; see also Defendant Klein's letter dated March 24, 2009 to Steven L. Brown, Esq., attached as Exhibit O).

28.      The transfer of the Currituck, N.C. real estate from Rountree to Mr. DeWolf occurred in September 2002.  (See Defendant's Responses Nos. 3 and 6 dated September 2, 2010, to Plaintiff's First Set of Interrogatories, attached as Exhibit P).

29.      On September 25, 2002, a Quitclaim Deed was recorded in Currituck County, N.C. Register of Deeds from Rountree to Mr. Laurin DeWolf (the 'Currituck N.C. Transfer').

---

[7]      The N.C. Complaint also alleges the fraudulent conveyance of certain real estate in Virginia Beach, Virginia.  The North Carolina state court has stricken and dismissed all references to that alleged fraudulent conveyance by order entered April 12, 2004.  Motion for Summary Judgment ¶ 26. This Court, therefore, omits any reference to the Virginia conveyances.

(See Defendant's Response No. 3 dated September 2, 2010, to Plaintiff's Second Request for Admissions, attached as Exhibit A).

30.    The Currituck N.C. Transfer deed transferred a fifty percent (50%) interest in the Currituck, N.C. real estate to Mr. DeWolf.  (See Defendant's Response No. 4 dated September 2, 2010, to Plaintiff's Second Request for Admissions, attached as Exhibit A).

31.    Mr. Laurin DeWolf was already the owner of a 50% interest in the Currituck, N.C. real estate prior to the September 25, 2002, recording of the Quitclaim Deed.   (See Defendant's Response No. 5 dated September 2, 2010, to Plaintiff's Second Request for Admissions, attached as Exhibit A).

32.    Nunnery's N.C. Fraudulent Conveyance Claim filed on October 31, 2003, in Randolph County Superior Court was brought under the North Carolina version of the Uniform Fraudulent Transfer Act, N.C. G.S. § 39-23.1 et. seq.   (See Defendant's Response No. 5 dated September 2, 2010, to Plaintiff's First Request for Admissions, attached as Exhibit Q).

*Id.* ¶¶ 27–32.

The remainder of the Motion for Summary Judgment makes legal assertions, contending (i) that the Discharge Order discharged any claim of Nunnery against Rountree, (ii) that Nunnery has no claim to support the N.C. Fraudulent Transfer Proceeding, and (iii) that the continuation of the N.C. Fraudulent Transfer Proceeding by Nunnery and Klein is a violation of the Discharge Order, thereby entitling Rountree to entry of summary judgment and to an award of relief pursuant to the Complaint.  *Id.* ¶¶ 33–47.

C.  Response of Nunnery and Klein to the Motion for Summary Judgment

Neither Nunnery nor Klein submitted any opposing affidavits nor do they dispute any material factual allegation of the Motion for Summary Judgment.  In their Memorandum in Opposition to the Motion for Summary Judgment ("Memorandum"), Nunnery and Klein assert

11

that there is a factual dispute as to whether the transfer that forms the basis of the N.C. Fraudulent Transfer Proceeding occurred prepetition or postpetition. Rountree, according to Nunnery and Klein's assertions, claims this transfer occurred prepetition; Nunnery and Klein contend this transfer occurred postpetition. Nunnery and Klein argue that, to adjudicate the merits of the Complaint, this Court must resolve such a factual dispute. Memorandum at 1–4. Rountree, however, has admitted the timing contention of Nunnery and Klein. *See* Motion for Summary Judgment ¶ 27 ("The conveyance of the Currituck, N.C. real estate, the subject of the N.C. Fraudulent Conveyance Claim, occurred well after the Debtor's bankruptcy filing."); *id.* ¶ 28 ("The transfer of the Currituck, N.C. real estate from Rountree to Mr. DeWolf occurred in September 2002."). Counsel for Rountree reaffirmed the lack of factual dispute as to the timing of this transfer at oral argument on the Motion for Summary Judgment; Klein, on behalf of himself and as counsel for Nunnery, agreed. The postpetition occurrence of the alleged fraudulent transfer, therefore, is undisputed.

Nunnery and Klein assert that this Court, to the extent it must consider North Carolina law, should defer to the North Carolina state courts and abstain from any interpretation of the North Carolina Uniform Fraudulent Transfer Act (the "NCUFTA").[8] Memorandum at 5–6. Nunnery and Klein argue that Nunnery's claim asserted in the N.C. Fraudulent Transfer Proceeding was not discharged by the Discharge Order and that the claim arises from postpetition, tortious conduct independent of the conduct related to the discharged claim in the § 523 Proceeding. *Id.* at 6–9. Finally, Nunnery and Klein contend that Rountree's alleged fraud in this bankruptcy case should preclude any recovery here. *Id.* at 9–10.[9] It remains to assess the

---

[8]        N.C. Gen. Stat. §§ 39-23.1 *et seq.*

[9]        The Court will examine the legal arguments of the parties in substantially greater detail in

entitlement of Rountree to the entry of summary judgment here.

## II.  CONCLUSIONS OF LAW

### A.  The Standard for Adjudication of a Motion for Summary Judgment

The Court of Appeals for the Fourth Circuit has articulated the standards by which this

Court must measure a motion for summary judgment:

> Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Where a case is "decided on summary judgment, there have not yet been factual findings by a judge or jury, and [the appellant's] version of events . . . differs substantially from [the appellee's,] . . . courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the . . . motion."  *Scott v. Harris*, 550 U.S. 372, 127 S. Ct. 1769, 1774, 167 L. Ed. 2d 686 (2007) (internal quotation marks and alterations omitted).

> However, "[a]t the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  *Id.* at 1776 (quoting Fed. R. Civ. P. 56(c)).  Moreover, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (emphasis in original).

*Cloaninger ex rel. Estate of Cloaninger v. McDevitt*, 555 F.3d 324, 332 (4th Cir. 2009).  Judge

Pearson has summarized the parties' burdens in a summary judgment context:

> The moving party has the initial burden of proving that no genuine issue of fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  The burden

---

Part II, *infra*.

> then shifts to the nonmoving party to demonstrate that a triable
> issue of fact exists which precludes summary judgment against the
> nonmovant. *Holland v. Double G. Coal Co.*, 898 F. Supp. 351
> (S.D. W. Va. 1995).

*Equicredit Corp. v. Simms* (*In re Simms*), 300 B.R. 877, 879 (Bankr. S.D. W. Va. 2003). To

defeat a motion for summary judgment, the nonmoving party must go beyond the pleadings with

affidavits, depositions, interrogatories, or other evidence to show that there is a genuine issue for

trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Judge Anderson has defined the

threshold for materiality of facts to invoke a genuine dispute:

> Those facts which are "material" for purposes of summary
> judgment are identified by the substantive law of the claim
> asserted. In other words, only disputes over facts that might affect
> the outcome of the suit under the governing law will properly
> preclude the entry of summary judgment. *Anderson v. Liberty
> Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202
> (1986). An issue is "genuine" if the evidence is such that a
> reasonable jury could return a verdict for the non-moving party.
> *Id.*

*Hampton v. Conso Prods., Inc.*, 808 F. Supp. 1227, 1232 (D.S.C. 1992).

Once a summary judgment motion is filed, Rule 56(e)(2) of the Federal Rules of Civil

Procedure, as incorporated in bankruptcy proceedings by Rule 7056 of the Federal Rules of

Bankruptcy Procedure, provides the duties of the opposing party:

> When a motion for summary judgment is properly made
> and supported, an opposing party may not rely merely on
> allegations or denials in its own pleading; rather, its response
> must—by affidavits or as otherwise provided in this rule—set out
> specific facts showing a genuine issue for trial. If the opposing
> party does not so respond, summary judgment should, if
> appropriate, be entered against that party.

Fed. R. Civ. P. 56(e)(2). In considering a motion for summary judgment, "it remains the well

established rule that 'the judge's function is not himself to weigh the evidence and determine the

truth of the matter but to determine whether there is a genuine issue for trial.'" *Moore v. Morton*,

14

No. 91-2603, 1992 WL 46292, at *4 (4th Cir. Apr. 2, 1992) (unpublished table decision) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).   "Further, the issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."   *Id.* (quotations omitted) (citing *Anderson*, 477 U.S. at 248–49).

In their Memorandum filed in the instant matter, Nunnery and Klein presented the timing of the alleged fraudulent transfer as a genuine issue of material fact.  At the October 25, 2010 hearing on the Motion for Summary Judgment, however, Nunnery and Klein agreed that this issue of fact was no longer in dispute after Rountree, in her Motion for Summary Judgment and at the October 25, 2010 hearing, agreed that the alleged fraudulent transfer occurred postpetition in September 2002.[10]  The facts relevant to the Court's decision, therefore, are undisputed and set forth above in Part I, *supra*.

---

[10]      In their Memorandum, Nunnery and Klein state the following:

> [E]arlier in the case, when the Defendants moved for summary judgment, Plaintiff [Rountree] presented no written opposition, cited no cases, and came to Court merely to state that there were issues of fact such as when the transfer took place.  The Court accepted the argument of Plaintiff's counsel, who has now taken the opposite position, but the Court's Order disposing of the earlier motion for summary judgment clearly finds genuine issues of material fact, and they have not disappeared since the Court's finding.

Memorandum at 1–2.  The parties *now agree* as to the timing of the alleged fraudulent transfers.  Even if that issue of fact were a genuine issue of material fact during the adjudication of Nunnery and Klein's earlier Motion for Summary Judgment, the issue no longer exists as the fact, even if it is "material," is no longer disputed.  Without a genuine issue of material fact, the Court may proceed with its analysis and conclusions of law.

B.  Whether Rountree Is Entitled to Judgment as a Matter of Law

The Court now decides whether Nunnery and Klein, as a matter of law, have violated the discharge injunction by continuing an action to collect a discharged debt.  The Court examines the issue, first, by determining whether the continuation of the N.C. Fraudulent Transfer Proceeding violates the discharge injunction as it pertains to Rountree in her individual capacity, and, second, by deciding whether the discharge injunction prohibits the prosecution of the state court matter by Nunnery against the DeWolfs, and, if not, whether this Court at this time should enjoin the prosecution of the N.C. Fraudulent Transfer Proceeding against the DeWolfs because this prosecution hinders or affects the discharge received by Rountree.  Briefly, Nunnery and Klein argue that the N.C. Fraudulent Transfer Proceeding is an action to collect on a claim arising from postpetition tortious conduct, independent of the conduct giving rise to the prepetition claim scheduled in the bankruptcy case, and, therefore, not an action to collect on a discharged debt.  Rountree argues (i) that the NCUFTA does not support such an action and (ii) that the N.C. Fraudulent Transfer Proceeding is not such an action.  The Court agrees with Rountree and concludes that the N.C. Fraudulent Transfer Proceeding is an action to collect on the prepetition discharged debt, the continuation of which violates the discharge injunction as it pertains to Rountree in her individual capacity.  The Court further concludes, however, that the Discharge Order does not prohibit the prosecution of the N.C. Fraudulent Transfer Proceeding by Nunnery against the DeWolfs and that an injunction to prohibit the prosecution of the N.C. Fraudulent Transfer Proceeding against the DeWolfs is unwarranted as the prosecution does not hinder or affect Rountree's discharge.

1.  Whether the Continuation of the N.C. Fraudulent Transfer Proceeding Violates the Discharge
Injunction as It Pertains to Rountree in Her Individual Capacity

a.  The Discharge Injunction

This Court discussed the effect of the discharge injunction in *Cherry v. Arendall* (*In re*

*Cherry*), 247 B.R. 176 (Bankr. E.D. Va. 2000):

> A bankruptcy discharge operates as an injunction
> forbidding the commencement or continuation of an action, the
> employment of process, or an act, to collect, recover or offset any
> discharged debt as a personal liability of a debtor. . . .
>
> . . . .
>
> Subject to certain exceptions enumerated in § 523, § 727 of
> the Bankruptcy Code discharges a debtor from all debts that have
> arisen before the date of the order for relief.  Section 524(a) of the
> Bankruptcy Code permanently enjoins all creditor actions to
> collect debts discharged under § 727.   The purpose of the
> permanent injunction set forth in § 524 and reiterated in the
> discharge order is to effectuate one of the primary purposes of the
> Bankruptcy Code, to afford the debtor a financial fresh start.
> Congress designed and intended the permanent injunction to give
> complete effect to the discharge, to eliminate any doubt concerning
> the effect of the discharge as a total prohibition on debt collection
> efforts, and to ensure that once a debt is discharged, the debtor will
> not be pressured in any way to repay it.

*Cherry*, 247 B.R. at 181–82 (citations and quotations omitted).

The discharge injunction prohibits a creditor from enforcing a discharged claim against a

debtor *in personam*, but the discharge injunction does not prohibit the creditor from enforcing an

*in rem* claim against the debtor's property.  *See* 11 U.S.C. § 524(a)(2) (2011) ("A discharge in a

case under this title operates as an injunction against the commencement or continuation of an

action, the employment of process, or an act, to collect, recover or offset any such debt as a

*personal liability* of the debtor . . . ." (emphasis added)); *id.* § 524(e) ("Except as provided in

[§ 524(a)(3)], discharge of a debt of the debtor does not affect the liability of any other entity on,

17

or the property of any other entity for, such debt.").  The Supreme Court highlighted this aspect

of the discharge injunction in *Johnson v. Home State Bank*, 501 U.S. 78 (1990):

> [A] discharge extinguishes *only* "the personal liability of the
> debtor."   11 U.S.C. § 524(a)(1).   Codifying the rule of *Long v.
> Bullard*, 117 U.S. 617, 6 S. Ct. 917, 29 L. Ed. 1004 (1886), the
> Code provides that a creditor's right to foreclose on the mortgage
> survives  or  passes  through  the  bankruptcy.    *See*  11  U.S.C.
> § 522(c)(2); *Owen v. Owen*, 500 U.S. 305, 308–309, 111 S. Ct.
> 1833, 1835–1836, 114 L. Ed. 2d 350 (1991); *Farrey v. Sanderfoot*,
> 500  U.S.  291,  297,  111  S.  Ct.  1825,  1829,  114  L.  Ed.  2d  337
> (1991); H.R. Rep. No. 95-595, . . . at 361 [(1978)].
>
> . . . .
>
> [A] bankruptcy discharge extinguishes only one mode of enforcing
> a claim—namely, an action against the debtor *in personam*—while
> leaving intact another—namely, an action against the debtor *in
> rem*.

*Johnson*, 501 U.S. at 83–84 (emphasis in original).   Courts in this circuit have long followed the

principle that *in rem* claims survive the bankruptcy discharge, while *in personam* claims are

extinguished.    *See,  e.g.*,  *Cen-Pen  Corp.  v.  Hanson*,  58  F.3d  89,  92  (4th  Cir.  1995)  ("A

bankruptcy discharge extinguishes only *in personam* claims against the debtor(s), but generally

has no effect on an *in rem* claim against the debtor's property."); *Keene v. Charles*, 222 B.R.

511, 513 (E.D. Va. 1998) ("[I]t is well-established that liens pass through bankruptcy unaffected

. . . .   [A] bankruptcy discharges only *in personam* claims against the debtor while *in rem* claims

against the debtor's property generally remain unaffected."); *Stone Street Servs., Inc. v. Granati*

(*In re Granati*), 271 B.R. 89, 94 (Bankr. E.D. Va. 2001) ("The discharge does not . . . eliminate

valid liens.  Such liens normally pass through bankruptcy unaffected and may be enforced *in rem*

against the collateral after the bankruptcy case is concluded."); *Barzee v. Trammel* (*In re

Trammel*), 63 B.R. 878, 882 (Bankr. E.D. Va. 1986) ("Absent a lien avoidance proceeding under

section 522(f) of the Bankruptcy Code, liens survive a discharge in bankruptcy and continue in force . . . .").

Here, Nunnery and Klein have conceded at oral argument (i) that Nunnery has no *in rem* claim against the subject property in Currituck County, North Carolina, and (ii) that the N.C. Fraudulent Transfer Proceeding is not an action to collect on an *in rem* obligation.  Therefore, that the N.C. Fraudulent Transfer Proceeding seeks redress for a claim against Rountree *in personam*—and only *in personam*—is undisputed.

Although not argued in the papers or at oral argument, this Court further notes that a prayer for equitable remedies *in rem* does not convert a cause of action *in personam* to a cause of action *in rem*.  The United States Court of Appeals for the First Circuit discussed this principle within the context of fraudulent conveyance law in its recent decision of *Parker v. Handy* (*In re Handy*), 624 F.3d 19 (1st Cir. 2010).  There, the appellant, Christopher Parker, obtained a judgment against Walter Loeman, the ex-husband of the debtor-appellee, Michelle Handy.  *Id.* at 20.  Parker never obtained a lien or other provisional remedy on the judgment.  Loeman, while still married to Handy, allegedly transferred cash to Handy to hinder the collection efforts of his creditors.  *Id.*  The cash transfer enabled Handy to purchase her residence.  *Id.*  Parker brought an action against Handy, as Loeman's transferee, in Maine state court pursuant to Maine's version of the Uniform Fraudulent Transfer Act (the "UFTA")[11] to order the sale of Handy's residence for the benefit of Parker in satisfaction of his judgment against Loeman.  *Id.*  After the filing of the Maine proceeding, Handy filed for relief under Chapter 7 of the Bankruptcy Code, thereby staying the Maine proceeding.  *Id.*  Handy thereafter obtained her discharge.  *Id.*

---

[11]     A thorough discussion of the UFTA follows in Part II.B.1.b, *infra*.

19

Parker moved for relief from the automatic stay to proceed with his state court proceeding, arguing, among other things, the following:  "that his requested relief in state court included an order of sale of Handy's residence and that '[t]o this extent,' his claim against Handy was a claim in rem"; and "that Handy's discharge in bankruptcy would not affect this in rem claim even though he was an unsecured creditor."  *Id.* at 21.  The bankruptcy court denied Parker's motion after finding that Parker's claim was not an *in rem* claim.  The Bankruptcy Appellate Panel and, ultimately, the United States Court of Appeals for the First Circuit affirmed.  *Id.*  The First Circuit dismissed Parker's arguments as follows:

> It does not follow that Parker has stated a claim in rem.  He concedes that he did not obtain a lien, attachment, or provisional remedy.  He does not argue that the state district court exercised control over Handy's residence.  Parker argues only that he can maintain an in rem claim because he requested a constructive trust.
>
> No Maine case supports this argument and our view, like that of the BAP, is that Parker's request for a constructive trust did not of itself give rise to a cause of action in rem.  Constructive trusts are not substantive rights that confer a cause of action; they are remedial devices employed by courts once liability is found and where equity requires.  Without more, Parker cannot transform a request for a remedy in rem into a cause of action in rem.  It follows that before Handy's bankruptcy petition, Parker's unsuccessful claims against Handy were only in personam.

*Id.* at 22 (citations omitted).

This Court finds it appropriate to apply the reasoning of *Handy* to the instant facts. Nunnery has not obtained a lien, attachment, or other provisional remedy against property of Rountree; Nunnery has an unsecured claim against Rountree (for which she has already received her pro rata share of the proceeds of Rountree's bankruptcy estate).  Nunnery has commenced an action against Rountree under North Carolina's version of the UFTA.  Nunnery has requested equitable relief *in rem*—"setting aside the quitclaim deed transactions" and "setting aside the sale

of the Currituck property," N.C. Complaint at 6—on an undisputed *in personam* claim.  Given

the foregoing, a claim *in rem* does not follow Nunnery's requests for remedies *in rem*.  The N.C.

Fraudulent Transfer Proceeding, therefore, is a proceeding based on a claim *in personam*.

This Court must now determine the nature of the claim in the N.C. Complaint—*i.e.*,

whether the N.C. Fraudulent Transfer Proceeding is an action to collect on the prepetition claims

reduced to judgment against Rountree or an action to collect on postpetition tortious conduct,

independent of that which gave rise to the prepetition claims.  If the claim Nunnery asserts in the

N.C. Complaint is an action to collect on the prepetition claims against Rountree *in personam*, as

Rountree argues, then Nunnery and Klein have violated the discharge injunction.  Nunnery and

Klein do not dispute this legal conclusion.  Nunnery and Klein, however, characterize the N.C.

Fraudulent Transfer Proceeding as a "suit arising from tortious conduct independent of that

which gave rise to the scheduled claim, and that claim has not been discharged, nor had it ever

been scheduled."  Answer at 6.  If the N.C. Complaint pleads a suit arising from postpetition

tortious conduct, independent of that which gave rise to the scheduled claim, as Nunnery and

Klein argue, then the N.C. Fraudulent Transfer Proceeding seeks to enforce a postpetition claim,

and, therefore, does not violate the discharge injunction.

Despite Nunnery and Klein's characterization, the N.C. Complaint pleads an action to

collect on the prepetition claims reduced to judgment against Rountree *in personam*, and its

continuation, to this extent, violates the discharge injunction.  A discussion of the UFTA, as

follows, is necessary to reach this conclusion.

b.  The Uniform Fraudulent Transfer Act

Although not cited in the N.C. Complaint, the UFTA, as adopted by North Carolina,[12] is

the sole legal basis for the N.C. Complaint.  Nunnery and Klein have conceded this point.  The

NCUFTA provides as follows:

> § 39-23.4.  Transfers fraudulent as to present and future creditors.
>
> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
>> (1) With intent to hinder, delay, or defraud any creditor of the debtor; or
>>
>> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>>
>>> a. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>>>
>>> b. Intended to incur, or believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.
>
> . . . .
>
> § 39-23.5.  Transfers fraudulent as to present creditors.
>
> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor was insolvent at the time or the debtor became insolvent as a result of the transfer or obligation.
>
> (b) A transfer made by a debtor is voidable as to a creditor whose claim arose before the transfer was made if the transfer was

---

[12]      N.C. Gen. Stat. §§ 39-23.1 *et seq.*

made to an insider for an antecedent debt, the debtor was insolvent
at the time, and the insider had reasonable cause to believe that the
debtor was insolvent.

N.C. Gen. Stat. §§ 39-23.4 to -23.5 (2011); *see also* UFTA §§ 4–5 (providing the same statutory

language as N.C. Gen. Stat. §§ 39-23.4 to -23.5 with immaterial changes).  This Court, consistent

with the legislative intent of North Carolina, reads the NCUFTA with regard to the other states

that have enacted and interpreted the UFTA.  *See* N.C. Gen. Stat. § 39-23.11 ("This act shall be

applied and construed to effectuate its general purpose to make uniform the law with respect to

the subject of this Article among states enacting it."); *cf. Farstveet v. Rudolph ex rel. Eileen

Rudolph Estate*, 630 N.W.2d 24, 30 (N.D. 2000) ("In construing a statute derived from a uniform

act [here, North Dakota's version of the UFTA], we seek to effectuate its general purpose to

make uniform the law of those states which enact it.  Special deference is, therefore, given to

decisions of other jurisdictions interpreting the uniform act."); *Thompson v. Hanson*, 174 P.3d

120, 126 (Wash. Ct. App. 2007) ("Because an explicit purpose of the UFTA is uniformity among

the States that have adopted it, the interpretation of other courts also provides guidance.").

A determination that the continuation of the N.C. Fraudulent Transfer Proceeding

violates the discharge injunction as it pertains to Rountree mandates an understanding of the

UFTA.  Standing to bring suit under the UFTA requires a creditor-debtor relationship.  *See* N.C.

Gen. Stat. § 39-23.4(a) (2011) ("A transfer made or obligation incurred by a *debtor* is fraudulent

as to a *creditor* . . . ." (emphasis added)); *id.* § 39-23.5(a) (same); *id.* § 39-23.5(b) ("A transfer

made by a *debtor* is voidable as to a *creditor* . . . ." (emphasis added)); *Maloney v. Alliance Dev.

Grp., LLC*, No. 06 CVS 6776, 2006 WL 2787895, at *5 (N.C. Bus. Ct. Sept. 18, 2006) ("Relief

under the UFTA is predicated on the plaintiff's status as a creditor of the defendant." (citing N.C.

Gen. Stat. §§ 39-23.4, -23.5, -23.7)); *see also A.P. Props., Inc. v. Goshinsky*, 714 N.E.2d 519,

521 (Ill. 1999) ("[T]o sustain a claim under the Act [Illinois's version of the UFTA], the creditor must show that, at some time, it has 'a right to payment' that it can seek to recover from the debtor.   Stated simply, the Act requires a debtor/creditor relationship." (citations omitted)); *Sabitov v. Graines*, 894 N.E.2d 1310, 1322–23 (Ohio Ct. App. 2008) (concluding that plaintiffs lacked standing as creditors under Ohio's UFTA because the statute of limitations had run on their claim); *Tolle v. Fenley*, 132 P.3d 63, 66 (Utah Ct. App. 2006) ("For the UFTA to apply, the statute requires a creditor-debtor relationship." (quotations omitted)); *cf. Angell v. Kelly*, 336 F. Supp. 2d 540, 544–46 (M.D.N.C. 2004) (ascribing the rights of creditors under non-NCUFTA law to the rights of creditors under the NCUFTA).

The UFTA defines a "debtor" as "a person who is liable on a claim."  UFTA § 1(6); N.C. Gen. Stat. § 39-23.1(6) (same).  The UFTA defines a "creditor" as "a person who has a claim." UFTA § 1(4); N.C. Gen. Stat. § 39-23.1(4) (same).  A "claim" is "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."  UFTA § 1(3); N.C. Gen. Stat. § 39-23.1(3) (same).  A "right to payment" is "nothing more nor less than an enforceable obligation."  *Cohen v. de la Cruz*, 523 U.S. 213, 218 (1998) (quoting *Pa. Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 559 (1990)).  Given the broad definitions provided by the UFTA for "debtor," "creditor," and "claim," a creditor-debtor relationship may arise under a variety of circumstances, including tortious conduct.  *See, e.g.*, *Cox v. Hughes*, 781 So.2d 197, 201 (Ala. 2000) ("The debtor-creditor relationship is created not by a judgment, but by the wrong which produces the injury; and it is the date of the wrongful act, not the date of the filing of the suit or of the judgment, which fixes the status and rights of the parties.").

Still, the UFTA *itself* does not create rights to establish the requisite creditor-debtor relationship between a creditor and a debtor-transferor. *See Hullett v. Cousin*, 63 P.3d 1029, 1034 (Ariz. 2003) ("But while the UFTA defines a claim broadly, such a claim must be an enforceable obligation. . . . The rationale is that the UFTA is remedial; *it does not create new claims*." (citations omitted and emphasis added)). The UFTA, rather, is a creditor-protection statute that prevents debtors from placing assets beyond the reach of otherwise unsecured creditors. *See* UFTA § 1 cmt. 2 ("This Act, like its predecessor and the Statute of 13 Elizabeth, declares rights and provides remedies for unsecured creditors against transfers that impede them in the collection of their claims."); *see also, e.g.*, *Thompson v. Hanson*, 239 P.3d 537, 542 (Wash. 2010) ("The overriding purpose of the UFTA is to provide relief for creditors whose collection on a debt is frustrated by the actions of a debtor to place the putatively satisfying assets beyond reach of the creditor."); *Badger State Bank v. Taylor*, 688 N.W.2d 439, 448 (Wis. 2004) ("The Uniform Fraudulent Transfer Act reflects a strong desire to protect creditors and to allow for the smooth functioning of our credit-based society. It is a creditor-protection statute."); *Am. Nat'l Red Cross v. ASD Specialty Healthcare, Inc.*, 888 So.2d 464, 465 (Ala. 2003) ("The purpose of the AUFTA [Alabama's version of the UFTA] is to prohibit the fraudulent transfer of property by a debtor who intends to defraud creditors by placing assets beyond their reach." (quotations omitted)); *Gilchinsky v. Nat'l Westminster Bank N.J.*, 732 A.2d 482, 488 (N.J. 1999) ("The purpose of the Fraudulent Transfer Act . . . is to prevent a debtor from placing his or her property beyond a creditor's reach." (citations omitted)); *Burrows v. Burrows*, 886 P.2d 984, 988 (Okla. 1994) ("The purpose of the Act [the UFTA] is to allow a creditor the opportunity to invalidate the transfer of assets made by a debtor if the transfer has the effect of placing assets out of reach of present and future creditors."); *Wohlstein v. Aliezer*, No. 14-08-00751-CV, 2010

WL 3221922, at *8 (Tex. Ct. App. Aug. 17, 2010) ("TUFTA [Texas's version of the UFTA] was designed to prevent a debtor from defrauding its creditors by moving assets out of reach."); *Tolle v. Fenley*, 132 P.3d 63, 66 (Utah Ct. App. 2006) ("The UFTA provides a remedy against debtors who seek to defraud a creditor or avoid a debt.  Transfers of property designed to place a debtor's assets beyond the reach of the debtor's creditors are void as to the creditors."); *Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd.*, 80 S.W.3d 601, 607 (Tex. Ct. App. 2002) ("The purpose of UFTA is to prevent fraudulent transfers of property by a debtor who intends to defraud creditors by placing assets beyond their reach.").

The UFTA embraces the well-settled principle that only one prejudiced by an allegedly fraudulent transfer may attack the transfer through fraudulent conveyance law.  *See INNK Land & Cattle Co. v. Kenkel*, 546 N.W.2d 585, 589 (Iowa 1996) ("It is essential in an action to set aside an allegedly fraudulent conveyance that the creditor establish that it was prejudiced as a result of the transfer."); *Fidelity Nat'l Title Ins. Co. v. Schroeder*, 101 Cal. Rptr. 3d 854, 859 (Cal. Ct. App. 2009) ("A transfer in fraud of creditors may be attacked only by one who is injured thereby. . . .  [P]rejudice to the plaintiff is essential.  It cannot be said that a creditor has been injured unless the transfer puts beyond [her] reach property [she] otherwise would be able to subject to the payment of [her] debt." (citations and quotations omitted)); *Woodard v. Funderburk*, 846 So.2d 363, 366 (Ala. Civ. App. 2002) ("[F]raudulent conveyances may be attacked only by a party who is injured or damaged by the conveyance, and a stranger to the transaction who is neither a creditor [n]or a purchaser or otherwise affected has no standing to maintain the action." (citations and quotations omitted)); *cf. Chemtex, LLC v. St. Anthony Enters., Inc.*, 490 F. Supp. 2d 536, 542 (S.D.N.Y. 2007) ("To challenge a conveyance as fraudulent, a plaintiff must suffer prejudice or injury as a result of the conveyance at issue.").

26

With this principle in mind, section 7 of the UFTA provides prejudiced creditors with various remedies.  UFTA § 7.  North Carolina has enacted the entirety of section 7 of the UFTA as follows:

§ 39-23.7. Remedies of Creditors

(a) In an action for relief against a transfer or obligation under this Article, a creditor, subject to the limitations in G.S. 39-23.8, may obtain:

(1) Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim;

(2) An attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the procedure prescribed by Article 35 of Chapter 1 of the General Statutes;

(3) Subject to applicable principles of equity and in accordance with applicable rules of civil procedure,

a. An injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property;

b. Appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or

c. Any other relief the circumstances may require.

(b) If a creditor has obtained a judgment on a claim against the debtor, the creditor, if the court so orders, may levy execution on the asset transferred or its proceeds.

N.C. Gen. Stat. § 39-23.7 (2011); *see also id.* cmt. (1) ("The remedies specified in this section are not exclusive."); *id.* cmt. (6) ("The remedies specified in § 7 . . . are cumulative.").  Some courts have awarded monetary judgments, including judgments for punitive damages, against a debtor-transferor and her transferees under their respective versions of the UFTA.  *See Sensenich v. Molleur* (*In re Chase*), 328 B.R. 675, 679 (Bankr. D. Vt. 2005) (noting that Vermont's version

27

of the UFTA "allows the [creditor] to obtain a monetary judgment for the difference between the debt and the value of the property as an alternative to the order avoiding the transfer authorized [under federal law]"); *Youngstown Osteopathic Hosp. Ass'n v. Pathways Ctr. for Geriatric Psychiatry, Inc.* (*In re Youngstown Osteopathic Hosp. Ass'n*), 280 B.R. 400, 410 (Bankr. N.D. Ohio 2002) ("[T]he court may order the party that committed the fraudulent transfer to pay attorney fees and punitive damages."); *Hansard Constr. Corp. v. Rite Aid of Fla., Inc.*, 783 So.2d 307, 308–09 (Fla. Dist. Ct. App. 2001) (finding that the catchall provision of Florida's version of UFTA § 7(a)(3)(iii)—"any other relief the circumstances may require"—encompasses a monetary judgment); *Profeta v. Lombardo*, 600 N.E.2d 360, 363–64 (Ohio Ct. App. 1991) (finding that the trial court did not abuse its discretion by awarding a monetary judgment against a debtor and his initial transferee based upon Ohio's UFTA).   Other courts have limited their judgments awarded under their respective versions of the UFTA to the equitable remedies provided therein.   *See Forum Ins. Co. v. Devere Ltd.*, 151 F. Supp. 2d 1145, 1148 (C.D. Cal. 2001) ("Terms such as 'liability' and 'damages' do not appear in the statute.   Thus, by its terms, UFTA allows only equitable remedies such as avoidance, attachment, an injunction, or appointment of a receiver.   Upon finding an [*sic*] UFTA violation, the court may cancel the transfer or impose a lien against the transferred property, but it may not award damages." (citations omitted)); *N. Tankers (Cyprus) Ltd. v. Backstrom*, 968 F. Supp. 66 (D. Conn. 1997) ("The Uniform Fraudulent Transfer Act, adopted by Connecticut, provides statutory equitable remedies for fraudulent transfers but does not allow for the assessment of punitive damages." (citations omitted)); *Morris v. Askeland Enters., Inc.*, 17 P.3d 830, 832–33 (Colo. App. 2000) (concluding that punitive damages is an unavailable remedy under the UFTA as enacted in Colorado).

Regardless of whether a court awards monetary damages under its version of the UFTA, UFTA remedies undoubtedly afford otherwise unsecured creditors the opportunity to collect on their debtors' *in personam* obligations by pursuing equitable remedies *in rem*.  Again, remedies *in rem* do not create independent causes of action *in rem*.  *See In re Handy*, 624 F.3d at 22 (finding that, within the context of the UFTA, a creditor, without a prior lien, attachment, or other provisional remedy, "cannot transform a request for a remedy in rem into a cause of action in rem").  Accordingly, an unsecured creditor's cause of action under the UFTA is *in personam* even if the unsecured creditor ultimately seeks a remedy *in rem*.

Here, the N.C. Complaint, as set forth in relevant part in Part I.B, *supra*, speaks for itself. The N.C. Complaint pleads nothing other than an action by an unsecured creditor to collect on prepetition claims on the basis of fraudulent conveyance law.  The N.C. Complaint first alleges the requisite creditor-debtor relationship—Rountree, as judgment debtor, and Nunnery, as judgment creditor, pursuant to the judgment on the prepetition Privacy Claims.  N.C. Complaint ¶¶ 5, 7–8.  Next, the N.C. Complaint describes the transactions between Rountree, Laurin DeWolf and April DeWolf, as alleged insiders, and Rachel Grout and Stephen Grout, as ultimate *bona fide* purchasers.  *Id.* ¶¶ 9–10, 12–15, 21, 23.  The N.C. Complaint pleads fraudulent intent: "for purposes of defrauding creditors, including [Nunnery]," *id.* ¶ 11; "for purposes of defrauding the creditors of [Rountree], and others, including [Nunnery]," *id.* ¶ 13; "to defraud the creditors of Rountree, and others, including [Nunnery]," *id.* ¶ 17; "with intent to hinder, delay or defraud creditors of Rountree," *id.* ¶¶ 25, 27; "for purposes of defrauding [Nunnery]," *id.* ¶ 33.  The N.C. Complaint pleads an unfair exchange:  "without receiving a reasonably equivalent value in exchange for it, while [Rountree] was engaged or about to be engaged in litigation with [Nunnery], and her remaining assets were unreasonably small in relation to the amount of a

judgment she could incur in the Privacy Claim," *id.* ¶¶ 25, 27.  The N.C. Complaint pleads Rountree's insolvency:  "Rountree was insolvent at that time or became insolvent as a result of that transfer or obligation," *id.* ¶¶ 29, 31.  The N.C. Complaint pleads transfers to insiders: "made to an insider," *id*.

Significantly, the N.C. Complaint alleges no prejudice to Nunnery resulting from the transfer of the North Carolina property other than prejudice to her collection efforts on her judgment, which, in fact, Nunnery specifically alleges in paragraph thirty-three (33) of the N.C. Complaint:  "for purposes of defrauding [Nunnery] and frustrating her remedies in collecting the Judgment referred to hereinabove."  *Id.* ¶ 33.  The N.C. Complaint alleges no facts suggesting that Nunnery was in any way involved with the alleged fraudulent transfers.  Again, Nunnery has not obtained a lien, attachment, or other provisional remedy against property of Rountree.  Other than her status as an unsecured creditor as a result of her prepetition claims reduced to judgment, Nunnery is a stranger to the transfers.  With nothing further, this Court cannot find any "tortious conduct independent of that which gave rise to the scheduled claim" creating a creditor-debtor relationship to which Nunnery may state a claim for relief under the NCUFTA.

The case law Nunnery and Klein have provided in support of their assertion that Nunnery has a claim under the UFTA arising from tortious conduct independent of that which gave rise to the scheduled claim is unpersuasive.  Nunnery and Klein cite *Filip v. Bucurenciu*, 28 Cal. Rptr. 3d 884 (Cal. Ct. App. 2005), in support of their argument that the alleged fraudulent transfers themselves are actionable as tortious conduct.  In *Filip*, a judgment creditor, having previously obtained a substantial monetary award in a separate action, brought a second action against his judgment debtors under California's version of the UFTA, alleging, in part, that the judgment debtors "conspired" to conceal certain real property from the judgment creditor's reach.  *Filip*, 28

30

Cal. Rptr. 3d at 886.  The trial court agreed with the judgment creditor and determined that the

judgment debtors conspired with each other to conceal their assets.  *Id.* at 888.  The judgment

debtors appealed, arguing, among other things, that "there can be no conspiracy because there is

no underlying tort."  *Id.* at 892.  In dispensing with this argument, the appellate court stated, "[A]

claim under the UFTA in fact involves tortious conduct.  In fraudulently transferring property,

tortious conduct occurred."  *Id.*  Nunnery and Klein read the appellate court's statement—"[i]n

fraudulently transferring property, tortious conduct occurred," *id.*—out of context.   This

statement does not suggest that a claim under the UFTA arises from the transfer standing alone

in a vacuum; rather, the statement presupposes that the transfer prejudiced the judgment debtors'

creditors.  In other words, the transfers were "tortious" because the transfers were "fraudulent,"

and the transfers were "fraudulent" because the transfers prejudiced creditors of the defendants

by concealing assets upon which the creditors potentially could collect.  The appellate court even

discussed this prejudice in its opinion at length.  *Id.* at 890.  Without prejudice to the judgment

debtors' creditors, the transfers could not be "fraudulent" or "tortious."  The appellate court also

clarified the effect of the trial court's conspiracy determination as follows:

> On a more fundamental level, defendants overemphasize the role
> the conspiracy cause of action played in this case.  The conspiracy
> allegations served to bolster and explain plaintiff's claims under
> the UFTA.   Plaintiff asserted that defendants fraudulently
> transferred property, and presented abundant evidence to support
> that claim.  Whether defendants conspired to do so has no effect on
> the judgment:  the transfers were fraudulent and plaintiff was
> entitled to relief.

*Id.* at 893.  Because the conspiracy determination had no effect on the judgment rendered with

respect to California's version of the UFTA, the language on which Nunnery and Klein rely is, at

best, dictum.  Because Nunnery and Klein read *Filip* out of context, the language of *Filip* simply

cannot support Nunnery and Klein's argument.

Nunnery and Klein also argue that the availability of punitive damages as a remedy under some interpretations of the UFTA suggests that the holder of a claim like Nunnery's may have standing to pursue a claim under the NCUFTA against a debtor like Rountree:

> The interpretation of U.F.T.A. varies from state to state, and it is by no means a foregone conclusion that the quotations from selected states regarding the nature of the U.F.T.A. as not creating any new basis for liability would be adopted in North Carolina. In some states, . . . a fraudulent conveyance is viewed as an independent tort. Were it not an independent basis for relief, it would not have been supportive of a claim for punitive damages as was held in this case [*Filip*]. Three other states hold that punitive damages are available in such a claim. As of 2004, . . . Utah, Missouri, and Ohio allowed punitive damages in fraudulent conveyance actions, indicating that they are not merely another collection instrumentality but constitute a basis for substantive liability. [The United States Court of Appeals for the Seventh Circuit, in *DFS Secured Healthcare Receivables Trust v. Caregivers Great Lakes, Inc.*, 384 F.3d 338 (7th Cir. 2004),] . . . deferred to the courts of the State of Indiana to see if Indiana would adopt that same rule, and a response to that effect was made by the Indiana Supreme Court.

Memorandum at 8–9 (citations omitted).

The Court disagrees. To begin, *DFS Secured* cannot support Nunnery and Klein's argument because that case only certified the question of "whether punitive damages are available under the IUFTA [the Indiana Uniform Fraudulent Transfer Act]" to the Indiana Supreme Court. *DFS Secured*, 384 F.3d at 355. More importantly, even if punitive damages are allowable as a remedy under the NCUFTA, Rountree could not be liable to Nunnery for such a remedy because Nunnery has no enforceable claim against Rountree.[13] *Cf. Hullett*, 63 P.3d at 1034 ("But while the UFTA defines a claim broadly, such a claim must be an enforceable obligation. . . . The rationale is that the UFTA is remedial; *it does not create new claims*."

---

[13]    As discussed in Part II.B.2.a, *infra*, this Court makes no decision as to Nunnery's rights and remedies against the DeWolfs under the NCUFTA.

(citations omitted and emphasis added)).  Again, Nunnery obtained no lien or other provisional remedy against the subject property, and, accordingly, Nunnery has no *in rem* claim against the subject property.  Other than her status as an unsecured creditor with respect to her prepetition claims reduced to judgment, Nunnery is a stranger to the postpetition transfer.  Rountree's discharge in this proceeding permanently enjoined the enforcement of the *in personam* obligation of Rountree to Nunnery.

Having determined that the discharge injunction prohibits the prosecution of the N.C. Fraudulent Transfer Proceeding against Rountree individually, this Court is left to decide whether the discharge injunction prohibits the prosecution of the N.C. Fraudulent Transfer Proceeding against the nondebtor defendants, the Dewolfs, and, if not, whether this Court at this time should enjoin the prosecution of the N.C. Fraudulent Transfer Proceeding against the DeWolfs because this prosecution hinders or affects the discharge received by Rountree.

2.  Whether This Court Should Enjoin the Continuation
of the N.C. Fraudulent Transfer Proceeding Against the Nondebtor Defendants

Rountree also prays that this Court enjoin the prosecution of the N.C. Fraudulent Transfer Proceeding against Rountree's codefendants named therein, the DeWolfs.  Rountree argues that the prosecution of the N.C. Fraudulent Transfer Proceeding by Nunnery against the DeWolfs affects the Discharge Order here and deprives Rountree of the benefit of the Discharge Order.  In the N.C. Fraudulent Transfer Proceeding, Nunnery alleges that the DeWolfs are the recipients of the alleged fraudulent transfer and are therefore liable to Nunnery for the value of the interest of the property Rountree allegedly transferred to them.  This prayer, therefore, presents two bankruptcy issues as to the nondebtor defendants in the N.C. Fraudulent Transfer Proceeding: whether the Discharge Order prohibits the prosecution of the state court matter by Nunnery

against the DeWolfs, and, if not, whether this Court at this time should enjoin the prosecution of

the N.C. Fraudulent Transfer Proceeding against the DeWolfs because this prosecution hinders

or affects the discharge received by Rountree.

### a. Whether the Discharge Order Prohibits the Prosecution of the N.C. Fraudulent Transfer Proceeding Against the DeWolfs

The analysis here must begin with the discharge provisions of § 524 of the Bankruptcy

Code as it relates to third parties.   Section 524(e) reads as follows:  "Except as provided in

subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of

any other entity on, or the property of any other entity for, such debt."  11 U.S.C. § 524(e)

(2011).  The intent of § 524(e) is self-evident:

> Section 524 makes clear that a bankruptcy discharge operates as a continuing stay after the close of the case, enjoining only acts to recover or offset discharged debts "as a personal liability of the debtor."  *In re Northeast Glass, Inc.*, 112 B.R. 475, 477 (Bankr. D. Mass. 1990); 11 U.S.C. § 524(a)(2).  It "does not affect the liability of any other entity on, or the property of any other entity for, such debt."  *Northeast Glass*, 112 B.R. at 478, 11 U.S.C. § 524(e).  "The discharge in bankruptcy, along with the coextensive permanent injunction and fresh start, are exclusive to the debtor, and do not otherwise affect the enforcement of any underlying debt, or any nondebtor liability thereon."  *In re Jason Pharmaceuticals, Inc.*, 224 B.R. 315, 321 (Bankr. D. Md. 1998).  Just as the discharge is personal to the debtor, so to [*sic*] is the permanent injunction arising from § 524(a).  *Id.* at 322.
>
> What is important to keep in mind is that a discharge in bankruptcy does not extinguish the debt itself but merely releases the debtor from personal liability which, by virtue of section of [*sic*] 524(a)(2) bars its enforcement against him.  The debt still exists, however, and can be collected from any other entity that might be liable.  *In re Lembke*, 93 B.R. 701, 702 (Bankr. D.N.D. 1988).

*In re Craig*, 325 B.R. 804, 806 (Bankr. N.D. Iowa 2005).  Paramount to an understanding of

§ 524(e) is the notion that the discharge pursuant to § 524 does not extinguish a debt:

> In a separate line of cases, the courts, including the Third Circuit Court of Appeals, have recognized that "discharged" debts continue to exist despite their unenforceability against the debtor on the basis of 11 U.S.C. § 524(e), which states "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." *See, e.g., First Fidelity Bank v. McAteer*, 985 F.2d 114, 118–19 (3d Cir. 1993) (holding that § 524(e) did not release non-debtor parties from their obligations and liabilities arising from the discharged debt) (collecting cases); *see also Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1449 (6th Cir. 1993) (holding debtor's discharge did not affect guarantor's obligation to creditor); *Hendrix v. Page (Matter of Hendrix)*, 986 F.2d 195, 197 (7th Cir. 1993) (relying on §§ 524(a)(2) and 524(e)); *Walker v. Wilde (In re Walker)*, 927 F.2d 1138, 1141–44 (10th Cir. 1991) (holding § 524(e) did not prohibit creditor from bringing action against the debtor to establish existence of the debt, albeit "discharged," that was a prerequisite to suit against guarantor); *Sandy Ridge Dev. Corp. v. Louisiana Nat'l Bank (Matter of Sandy Ridge Dev. Corp.)*, 881 F.2d 1346, 1351 (5th Cir. 1989) (holding that discharge does not release non-debtor guarantors); *Kathy B. Enter., Inc. v. United States*, 779 F.2d 1413, 1414–15 (9th Cir. 1986) (holding that discharge did not prevent the IRS from collecting discharged taxes from recipient of debtor's fraudulent conveyance); *Pettibone Corp. v. Hawxhurst*, 163 B.R. 989, 993–95 (N.D. Ill.), *aff'd*, 40 F.3d 175 (7th Cir. 1994).  These cases, and the plain language of § 524 itself, all illustrate Congress's underlying premise in enacting § 524:  although unenforceable in their pre-[discharge] form against the debtor, "discharged" debts, and their attendant duties, obligations, and liabilities, remain viable post-[discharge].  Thus, while the creditor may not *enforce* her claim as it existed pre-[discharge], the claim nevertheless continues to *exist*.

*United States v. Conston, Inc. (In re Conston, Inc.)*, 181 B.R. 769, 773 (D. Del. 1995); *see also*

*U.S. Fire Ins. Co. v. Weishorn*, No. 3:08 CV 226-MU, 2009 WL 3300040, at *2 (W.D.N.C. Oct.

13, 2009, as amended Oct. 14, 2009) ("Although the Bankruptcy Act discharges the debts of the

bankrupt, § 524(e) of the Act preserves the right of claimants to pursue 'any other entity'—

including an insurance company—that is liable for the discharged debt."); *In re Jason Pharm.,*

*Inc.*, 224 B.R. 315, 321 (Bankr. D. Md. 1998) ("[T]he discharge in bankruptcy, along with the

coextensive permanent injunction and fresh start, are exclusive to the debtor, and *do not otherwise affect the enforcement of any underlying debt, or any nondebtor liability thereon*." (emphasis in original)).

Despite its plain language, a literal application of the provisions of § 524(e) is not mandated:

> Whatever the result might be as to the application of § 524(e) in other cases, we do not think that section must be literally applied in every case as a prohibition on the power of the bankruptcy courts, as appellants would have us apply it here. In this situation where the Plan was overwhelmingly approved, where the Plan in conjunction with insurance policies provided as a part of a plan of reorganization gives a second chance for even late claimants to recover where, nevertheless, some have chosen not to take part in the settlement in order to retain rights to sue certain other parties, and where the entire reorganization hinges on the debtor being free from indirect claims such as suits against parties who would have indemnity or contribution claims against the debtor, we do not construe § 524(e) so that it limits the equitable power of the bankruptcy court to enjoin the questioned suits. We leave questions concerning cases in which § 524(e) does apply for another day.

*Menard-Sanford v. Mabey* (*In re A.H. Robins Co.*), 880 F.2d 694, 702 (4th Cir. 1989).[14]

---

[14]   Some courts have found that "[a]ctions which, regardless of their superficial rationalization, are intended and actually work to extort payment of a discharged debt, may violate the discharge under § 524 . . . ." *Jacobs v. Oklahoma* (*In re Jacobs*), 149 B.R. 983, 991 (Bankr. N.D. Okla. 1993) (citing *In re Guinn*, 102 B.R. 838, 843 (Bankr. N.D. Ala. 1989) (finding that a credit union's policy of "shun[ning] equally any member who causes it loss," as applied to a bankrupt-debtor's dischargeable debts, may nevertheless violate the injunctive provisions of §§ 362(a)(6) and 524(a)); *Olson v. McFarland Clinic, P.C.* (*In re Olson*), 38 B.R. 515, 518 (Bankr. N.D. Iowa 1984) (finding that the defendant's continuing refusal to provide medical treatment to the discharged debtor was an action to collect a prepetition, discharged debt, in violation of § 524(a)(2)); *In re Goodman*, 34 B.R. 23, 24 (Bankr. D. Or. 1983) ("The defendant violated . . . § 524(a)(2) . . . by causing the arrest of the debtor after discharge for the purpose of collecting two NSF checks . . . , covering a debt for past rent which was ultimately discharged in the pending bankruptcy."); *Lanford v. Macalester College* (*In re Lanford*), 10 B.R. 132, 134 (Bankr. D. Minn. 1981) (concluding that a college's withholding a bankrupt-student's transcript was an action to collect a prepetition debt)). These cases, however, all concern creditor actions taken directly against discharged debtors. *See, e.g.*, *Jacobs*, 149 B.R. at 993 (concerning an insurance commissioner's attempt to revoke debtor's insurance agent license for nonpayment of debt).

Application of this principle among the courts of the Fourth Circuit appears to have been largely limited to circumstances like those present in *A.H. Robins*, when an injunction is granted for the benefit of third parties as part of a Chapter 11 plan confirmation process.  *See, e.g.*, *Hodge v. Moore* (*In re Railworks Corp.*), 345 B.R. 529, 536 (Bankr. D. Md. 2006) ("The Court of Appeals for the Fourth Circuit has determined that the bankruptcy court may release the liabilities of non-debtors in certain circumstances, including when the plan is overwhelmingly approved and where the injunction is essential to a workable reorganization, leaving open the question of when or if Section 524(e) may apply to limit third party injunctions.").

However, in the context of application of § 524 to efforts to use its provisions to bar prosecution of suits against nondebtor transferees of alleged fraudulent conveyances, courts have found that the discharge of a debtor does not prohibit an action against the transferees. Illustrative is *Kathy B. Enterprises, Inc. v. United States*, 779 F.2d 1413 (9th Cir. 1986).  There, the Internal Revenue Service (the "IRS") attempted to collect taxes from a transferee to which the debtor had fraudulently conveyed its assets.  *Kathy B. Enters.*, 779 F.2d at 1414.  The alleged transferee filed suit in federal district court to enjoin the IRS's collection efforts.  *Id.*  The United States Court of Appeals for the Ninth Circuit found no basis to enjoin the action against the alleged transferee:

> The language of this section [§ 524(e)] is clear and appears to dispose of [the transferee's] claim.  But [the transferee] claims that this section applies only to cases in which "the other entity" had a direct contractual relationship with the creditor, such as guarantor of the discharged debt.  It points out that there is no reference in the legislative history to a situation such as this one, where no link between the third party and the "other entity" exists other than that based on a state law invalidating fraudulent conveyances.
>
> The government's position is more persuasive.  Section 16 of the old Bankruptcy Act provided:

37

> The liability of a person who is a co-debtor with or guarantor or in any manner a surety for, a bankrupt shall not be altered by the discharge of a bankrupt.

Ch. 541, 30 Stat. 544, 550 (1898).

> When Congress passed the comprehensive Bankruptcy Code in 1978, it replaced this provision—which listed three specific exemptions from discharge—with expansive language denying "any other entity" a discharge of the debt. It is hard to view this change as anything but a legislative mandate further to constrict the effect of a discharge.

*Id.* at 1414–15; *accord Power Equities, Inc. v. Atlas Telecom Servs.-USA, Inc*., No. 3:06-CV-1892-G, 2007 WL 43843, at *2 (N.D. Tex. Jan. 5, 2007) ("Upon an analysis of the applicable law . . . it is clear that [the defendant's] Rule 12(b)(6) motion to dismiss is baseless. *Though not expressly stated, the argument appears to be that ATS, the recipient of an allegedly fraudulent transfer, should be able to shield the proceeds of that transfer from the creditors of the transferor because the transferor filed for bankruptcy and obtained relief under the bankruptcy code*." (emphasis added)); *see also Pasian v. Leonetti* (*In re Pasian*), Bankr. No. 94-31563-TEC, Adv. No. 09-3182-TC, 2010 WL 935598, at *2 (Bankr. N.D. Cal. Mar. 15, 2010) ("Nor does the bankruptcy discharge enjoin Leonetti from suing the transferee of a prepetition fraudulent transfer made by Debtor, even if Debtor's pre-transfer liability to Leonetti was discharged." (citing 11 U.S.C. § 524(e); Cal. Civ. Code §§ 3439.04, 3439.07; *Sanwa Bank Cal. v. Chang*, 87 Cal. App. 4th 1314, 1319 (2001))); *In re Craig*, 325 B.R. 804, 806 (Bankr. N.D. Iowa 2005) ("The application of § 524(a) is problematic in this case. Generally, this section enjoins collection efforts against the debtor after the discharge is entered but allows collection efforts against any nondebtor party jointly liable on the debt. In this case, Joyce Craig [the debtor's wife sued by the creditor] is neither a debtor nor jointly liable on the debt."); *In re Boynewicz*,

No. 02-30250-LMW, 2002 WL 33951315, at *2 n.5 (Bankr. D. Conn. Nov. 27, 2002) ("[O]nce

the automatic stay is terminated Cadle could proceed with its own fraudulent transfer claims (if

any) against the Debtor's wife notwithstanding the Discharge." (citing *Kathy B. Enters., Inc.*, 779

F.2d at 1415)).

The Discharge Order herein was for the benefit of Rountree and not her codefendants in

the N.C. Fraudulent Transfer Proceeding, and, accordingly, there is no basis to enjoin the

prosecution of the N.C. Fraudulent Transfer Proceeding against Rountree's codefendants.  This

Court must limit its consideration here to the bankruptcy issues presented with regard to the

nondebtor defendants in the N.C. Fraudulent Transfer Proceeding:  whether the Discharge Order

prohibits the prosecution of the state court matter by Nunnery against the DeWolfs, and, if not,

whether the Court at this time should enjoin the prosecution of the N.C. Fraudulent Transfer

Proceeding against the DeWolfs because this prosecution hinders or affects the discharge

received by Rountree.  The defense asserted on behalf of the DeWolfs here by Rountree that a

discharged debt may not be a basis for a claim under the NCUFTA against the DeWolfs presents

a defense by a nondebtor party which sounds exclusively under North Carolina law.  Given the

Court's conclusion that the Discharge Order here does not prohibit the prosecution of the N.C.

Fraudulent Transfer Proceeding against the DeWolfs, the resolution of the merits of this defense

is best left to the North Carolina state courts.

b.  Whether This Court at This Time Should Enjoin the Prosecution of the N.C. Fraudulent
Transfer Proceeding Against the DeWolfs Because This Prosecution Hinders or Affects the
Discharge Received by Rountree

To the extent the Complaint may be construed as seeking the issuance of an injunction by

this Court at this time to prohibit the prosecution of the N.C. Fraudulent Transfer Proceeding

against the DeWolfs under the pretense that it may hinder or affect Rountree's discharge, there appears to be no basis for the issuance of such an injunction. The courts of the Fourth Circuit appear to have been loath to enjoin proceedings against nondebtor parties, and have done so only in limited circumstances when the movant proved such an injunction necessary to protect the estate of and prevent interference with a reorganizing debtor. *See, e.g.*, *Menard-Sanford v. Mabey* (*In re A.H. Robins Co, Inc.*), 880 F.2d 694 (4th Cir. 1989); *Hodge v. Moore* (*In re Railworks Corp.*), 345 B.R. 529 (Bankr. D. Md. 2006*)*. Judge Tice of this Court has elaborated, in the context of the automatic stay, upon the unusual circumstances that a movant must present to invoke this authority:

> While the automatic stay provisions are generally said to be available only to the debtor and not to third party guarantors, the Fourth Circuit has held that in unusual circumstances the bankruptcy court can enjoin proceedings against non-debtor third parties pursuant to 11 U.S.C. § 105(a). *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1002–04 (4th Cir. 1986); *accord Willis v. Celotex Corp.*, 978 F.2d 146, 149–50 (4th Cir. 1992); *Dalkon Shield Claimants Trust v. Reiser* (*In re A.H. Robins Co., Inc.*), 972 F.2d 77, 82 (4th Cir. 1992). Where the identity of the debtor and the third party are inexorably interwoven so that the debtor may be said to be the real party against whom the creditor is proceeding a bankruptcy court may exercise equitable jurisdiction to enjoin proceedings against non-debtor third parties. 11 U.S.C. § 105(a); *A.H. Robins Co. v. Piccinin*, 788 F.2d at 1004 (citations omitted). For example, a situation may exist where proceeding against the third party would actually reduce or diminish property the debtor could otherwise make available to the creditors as a whole. *A.H. Robins Co. v. Piccinin*, 788 F.2d at 1008. Allowing such action would undermine two basic principles of chapter 11: to provide creditors with a compulsory and collective forum to sort out their relative entitlement to a debtor's assets and to provide the debtor with a realistic opportunity to formulate a plan of reorganization. *See A.H. Robins Co. v. Piccinin*, 788 F.2d at 998; *see also* Thomas H. Jackson, The Logic and Limits of Bankruptcy 4 (1986).

*F.T.L., Inc. v. Crestar Bank* (*In re F.T.L., Inc.*), 152 B.R. 61, 63 (Bankr. E.D. Va. 1993); *see also*

*Robbins v. Chase Manhattan Bank, N.A.*, No. 93-0063-H, 1994 WL 149597, at *3 (W.D. Va.

40

Apr. 4, 1994) ("In certain circumstances, an injunction may stay proceedings where there is a complete identity of interest between the debtor and non-debtor, when such proceedings will adversely impact the debtor's attempt to develop a reorganization plan and if the debtor's case meets the test for granting an injunction as articulated in *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189, 193 (4th Cir. 1977)."); *Crumpler v. Wetsel Seed Co.* (*In re Southside Lawn & Garden/Suffolk Yard Guard*), 115 B.R. 79, 81 (Bankr. E.D. Va. 1990) ("The court of appeals made it clear that the [*A.H. Robins Co.*] holding is quite limited in its application and that the automatic stay will not ordinarily be extended to the benefit of nondebtor parties.").

These circumstances are not in evidence here.  This case is not a reorganization proceeding, and, as the pleadings in the N.C. Fraudulent Transfer Proceeding exhibit, neither is property of the estate implicated there.[15]  Likewise, there is no showing as to exactly how the prosecution of the N.C. Fraudulent Transfer Proceeding against the DeWolfs in any manner affects the discharge received by Rountree.  The Motion for Summary Judgment, to the extent it seeks relief for the benefit of the DeWolfs, therefore, must be denied.

C.  Whether Rountree's Alleged Fraud Should Preclude Her from Obtaining Relief

Nunnery and Klein lastly argue that Rountree's alleged fraud with regard to the scheduling of the North Carolina property and certain other real property in Virginia in her bankruptcy schedules should preclude her from obtaining the relief requested in the Motion for Summary Judgment.  Memorandum at 9–10.  Nunnery and Klein argue:

> Plaintiff's fraud in this case was asserted as an affirmative
> defense to re-opening the case and the issuance of an injunction.

---

[15]     The N.C. Complaint alleges that the property transferred by Rountree to the DeWolfs has been subsequently transferred to Rachel Grout and Stephen Grout, as ultimate *bona fide* purchasers.

See Answer to Adversary Complaint, p. 6.  Her fraud is manifest in the following:

1. **The Currituck property**.  The Currituck property was not listed among her assets in her schedules, and, not by sheer convenience, did not officially appear to be acknowledged to be hers until after the six-figure judgment had been rendered against Plaintiff [Rountree].  Then, by no mere coincidence, it appeared and was disposed of immediately.  Sworn testimony from her father confirms this claim.  That it was conveyed in 1998, as the document would suggest, is belied by the terms of the document itself and the data that is on the notarial portion of the document.  These unabashed misrepresentations to the Court regarding her ownership of property, suggesting that her assets were nominal when in fact they included a parcel of property that sold just over a year later for $60,000.00, and a single-family home, suggests her propensity toward fraud.

2. **The Virginia Beach property**.  The Virginia Beach residence of the Plaintiff was listed as being hers in name only, yet she held onto its title until well after the discharge.  In his testimony, her father disclosed that the Virginia Beach property was given to him by his daughter in 1998 for no legitimate consideration.  The date of the gift is established by Deed as being in 2002, months beyond the discharge

*Id.*

The Defendants' allegations fail to show that a genuine issue of material fact exists with regard to whether they (Nunnery and Klein) violated the Discharge Order or the injunctive provisions of § 524.  Their allegations are unsupported as required by Rule 56 of the Federal Rules of Civil Procedure and demonstrate no material fact that the Court should find to be genuinely at issue such that summary judgment in favor of Rountree should be denied.  Fed. R. Civ. P. 56.  Additionally, the Defendants fail to demonstrate how the alleged fraudulent actions

by Rountree in this Court create a cause of action under the NCUFTA or how Nunnery may have been "prejudiced" by such fraud.  To reiterate, Nunnery only had a judgment against Rountree on the prepetition Privacy Claims.  She did not have a lien or any other provisional remedy to allow her to assert a claim against the North Carolina property.  The prepetition claims, as reduced to judgment, were held dischargeable, and Nunnery received a distribution from the Chapter 7 Trustee.

D.  Redress for Nunnery and Klein's Violation of the Discharge Injunction

Having concluded that Nunnery and Klein have violated the discharge injunction by continuing an action against Rountree to collect on the prepetition claims, the Court turns to Rountree's prayer for an order holding Nunnery and Klein in contempt and sanctioning Nunnery and Klein.  "A bankruptcy court has the power, pursuant to 11 U.S.C. § 105(a)[,] to hold a party in civil contempt and award sanctions."  *In re Byrd*, Nos. 04-35620-TJC, 01-25006-TJC, 433, 520, 2007 WL 2884396, at *5 (Bankr. D. Md. Sept. 27, 2007) (citing *Burd v. Walters* (*In re Walters*), 868 F.2d 665, 669–70 (4th Cir. 1989)).  Further, "[t]he violation of an injunction will not support a finding of contempt in all cases."  *Rhyne v. Cunningham* (*In re Rhyne*), 59 B.R. 276, 278 (Bankr. E.D. Pa. 1986).  The movant has the burden of demonstrating the elements of contempt by clear and convincing evidence.  *See Pague v. Harshman* (*In re Pague*), Bankr. No. 3:01-bk-32061, Adv. No. 3:09-ap-00071, 2010 WL 1416120, at *3 (Bankr. N.D. W. Va. Apr. 5, 2010) (citing *Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 301 (4th Cir. 2000)).  The Fourth Circuit has delineated the standards by which a movant must establish civil contempt:

> To establish civil contempt, a movant must show each of the following elements by clear and convincing evidence:

43

> (1) the existence of a valid decree of which the alleged contemnor had actual or constructive knowledge; (2) . . . that the decree was in the movant's "favor"; (3) . . . that the alleged contemnor by its conduct violated the terms of the decree, and had knowledge (at least constructive) of such violations; and (4) . . . that [the] movant suffered harm as a result.

*JTH Tax, Inc. v. H & R Block E. Tax Servs., Inc.*, 359 F.3d 699, 705 (4th Cir. 2004) (quoting *Ashcraft*, 218 F.3d at 301).

Here, the Court first must hold either or both of the Defendants in contempt for violation of the Discharge Order and the injunctive provisions of § 524 before it may impose an appropriate sanction.  Rountree carries the burden of proof.  The Court notes that the Discharge Order is a valid and final order; that the Court entered the Discharge Order in favor of Rountree; that Nunnery and Klein have actual or at least constructive knowledge of the existence of the Discharge Order; that Nunnery and Klein have actual or at least constructive knowledge that the Discharge Order discharged Rountree of her *in personam* obligation on the prepetition claims;[16] and that the continuation of the N.C. Fraudulent Transfer Proceeding against Rountree violated the Discharge Order and the injunctive provisions of § 524.  It remains to assess (i) whether and to what extent the Defendants had knowledge of their violation and (ii) whether and to what extent Rountree suffered harm as a result.

Contempt of a discharge injunction is sanctionable conduct.  This Court has extensively examined the nature of sanctions for the violation of § 524 of the Bankruptcy Code:

---

[16]     Klein also represented Nunnery through the entirety of the § 523 Proceeding, which began in 2001 and ended in 2007.  *See supra* Part I.A.

44

11 U.S.C. § 105(a) authorizes a bankruptcy court to hold a party in civil contempt for failing to comply with a previous order. The discharge injunction put in place pursuant to 11 U.S.C. § 524(a) is an order of the Bankruptcy Court whose violation is punishable by the imposition of civil sanctions. These sanctions may include actual damages, attorney's fees and, when appropriate, punitive damages. Judicial sanctions in civil contempt proceedings may, in a proper case, be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained. The measure of the court's power in civil contempt proceedings is determined by the requirements of full remedial relief. Thus, this Court may assess attorney's fees if Arendall's violation of the discharge injunction was willful.

The Fourth Circuit Court of Appeals has not heretofore addressed what constitutes a "willful" violation of the discharge injunction pursuant to § 524. The Eleventh Circuit Court of Appeals has considered the appropriate standard to apply to conclude a violation of the § 524 injunction was willful, reasoning that "the focus of the court's inquiry in civil contempt proceedings is not on the subjective beliefs or intent of the alleged contemnors in complying with the order, but whether in fact their conduct complied with the order at issue." [*Hardy v. IRS* (*In re Hardy*), 97 F.3d 1384, 1390 (11th Cir. 1996) (quoting *Howard Johnson Co. v. Khimani*, 892 F.2d 1512, 1516 (11th Cir. 1990)).] The court in that case analogized to the test that it had previously adopted to determine willfulness in violating the automatic stay provision of § 362 in *Jove Eng'g, Inc. v. I.R.S.* (*In re Jove Eng'g, Inc.*), 92 F.3d 1539 (11th Cir. 1996). There the court concluded that the defendant would be found in contempt if it: "(1) knew that the automatic stay was involved and (2) intended the actions which violated the stay." *In re Hardy*, 97 F.3d at 1390 (quoting *In re Jove Eng'g*, 92 F.3d at 1555). The court found such a measure appropriate in the context of a § 524 proceeding, writing "[t]his test is likewise applicable to determining willfulness for violations of the discharge injunction of § 524." *In re Hardy*, 97 F.3d at 1390.

The Court agrees with the holding in *Hardy* that the standard used for determining whether a stay violation was willful pursuant to § 362 may be used to determine whether a violation of the discharge violation was willful. In a civil contempt proceeding, the state of mind with which the contemnor violated a court order is irrelevant and therefore good faith, or the absence of an intent to violate the order, is no defense. As a result, it is

45

consistent to apply the precedents of the Fourth Circuit Court of Appeals concerning the determination of willfulness of a creditor's conduct in an automatic stay violation to measure the culpability of Arendall's conduct in his violation of the discharge injunction in the instant case.

*Cherry v. Arendall* (*In re Cherry*), 247 B.R. 176, 186–87 (Bankr. E.D. Va. 2000) (citations omitted).  The Fourth Circuit Court of Appeals has examined the issue of willfulness in the context of an automatic stay violation:

> The Fourth Circuit Court of Appeals has considered the necessary evidentiary showing to establish a willful violation of the automatic stay, holding that "to constitute a willful act, the creditor need not act with specific intent but must only commit an intentional act with knowledge of the automatic stay." *Citizens Bank v. Strumpf* (*In re Strumpf*), 37 F.3d 155, 159 (4th Cir. 1994), *rev'd on other grounds*, 516 U.S. 16, 116 S. Ct. 286, 133 L. Ed. 2d 258 (1995) (citing *Budget Service Co. v. Better Homes*, 804 F.2d 289, 292–93 (4th Cir. 1986)); *Cuffee v. Atlantic Bus. & Community Dev. Corp.* (*In re Atl. Bus. & Community Corp.*), 901 F.2d 325, 329 (3rd Cir. 1990).  In *Better Homes*, the court stated that the conduct of a creditor in violating the stay is willful when "[t]here is ample evidence in the record to support the conclusion that [the creditor] knew of the pending petition and intentionally attempted to [continue collection procedures] in spite of it." *Better Homes*, 804 F.2d at 292–93.  Accordingly, in order for conduct to be willful, it must be intentional or deliberate.  *See Hamrick v. United States* (*In re Hamrick*), 175 B.R. 890, 892 (W.D.N.C. 1994) (citing *In re Shealy*, 90 B.R. 176, 179 (Bankr. W.D.N.C. 1988)).  Courts, accordingly, have contrasted "willful" conduct by creditors with violations which were "inadvertent" and where no injury occurs. *See id.* at 893.  Thus, this Court must determine whether the violation of the discharge injunction pursuant to § 524 was intentional or deliberate so as to expose Arendall to an award of sanctions.

*Id.* at 187–88.  Courts of the Fourth Circuit also have examined the allowance of attorney's fees as an element of damage for a violation of a discharge injunction:

> At least two courts of the Fourth Circuit have awarded attorney's fees as an element of damage for violation of the discharge injunction.  *See, e.g.*, *In re Barbour*, 77 B.R. 530, 531–32 (Bankr. E.D.N.C. 1987); and *In re Thomas*, 184 B.R. 237, 240

46

(Bankr. M.D.N.C. 1995).   A case which declined to award attorney's fees where a discharge violation was found is *In re Brantley*, 116 B.R. 443 (Bankr. D. Md. 1990), where the complaint was filed by a Chapter 7 debtor to recover monies collected from her on a discharged note.   There it was determined the evidence showed "no bad faith, vexatious or wanton actions, or oppressive motivations" to justify an attorney's fees award.   *Id.* at 448.   The evidence also failed to show the creditor acted with actual knowledge of the wording of the discharge order.   Perhaps most importantly, the court recognized the cases permitting an award of attorney's fees for violations of the discharge injunction but noted that the "[d]ebtor did not bring this complaint as an action for contempt, and it was not presented to this Court as a contempt proceeding" and the failure to observe the notice and hearings requirements of Bankruptcy Rule 9020 made an award of attorney's fees inappropriate.   *Id.* at 450.

*Id.* at 189 n.22.  Finally, courts sometimes grant the award of punitive damages for a violation of

a discharge injunction:

A majority of courts allow punitive damages for violation of the discharge injunction.  [*See In re Arnold*, 206 B.R. 560, 566 (Bankr. N.D. Ala. 1997).]  Only one court of the Fourth Circuit, however, appears to have considered whether an award of punitive damages was appropriate in a discharge violation.  In [*Brantley v. Weeks* (*In re Brantley*), 116 B.R. 443 (Bankr. D. Md. 1990)], punitive damages were denied because of the absence of proof of actual knowledge of the bankruptcy case prior to the actions complained of by the debtor and, while the court there concluded the actions of one of the creditor defendants was deliberate, there was no showing of any "malevolent intent" on the part of the creditor.  *Id.* [at 449.]  In considering whether punitive damages are appropriate under the statutory authorization for an automatic stay violation under 11 U.S.C. § 362(h), courts have generally required a violation which occurs by way of egregious or vindictive conduct.  *See In re Carrigan*, 109 B.R. 167, 172 (Bankr. W.D.N.C. 1989) (citing *In re Midkiff*, 85 B.R. 467 (Bankr. S.D. Ohio 1988)).   Accordingly, whether expressed as "egregious conduct," "malevolent intent," or "clear disregard of the bankruptcy laws," each of these decisions appear to employ a finding of creditor conduct beyond willfulness or deliberation and more closely resembling a specific intent to violate the discharge injunction in order to assess punitive damages.

*Id.* at 189–90.  Some courts also have permitted the award of sanctions against an attorney as

47

well as a creditor when a violation of the discharge injunction occurred.  *See, e.g.*, *In re Jones*, 389 B.R. 146, 166–67 (Bankr. D. Mont. 2008) (holding, after an evidentiary hearing, a creditor and its attorney in contempt for "knowingly violat[ing] the bankruptcy discharge injunction of 11 U.S.C. § 524(a)" and holding the creditor and its attorney jointly and severally liable for $5,747.65 in compensatory damages and attorney fees); *Miller v. Mayer* (*In re Miller*), 81 B.R. 669, 679 (Bankr. M.D. Fla. 1988) (concluding, after an evidentiary hearing, that a creditor's attorney "willfully and knowingly violated the permanent injunction imposed by the general bankruptcy discharge issued to the Debtors," finding the creditor's attorney in "serious contempt" of the discharge order, and scheduling a hearing for sanctions); *cf. Rhyne v. Cunningham* (*In re Rhyne*), 59 B.R. 276, 279 (Bankr. E.D. Pa. 1986) (finding that a creditor's attorney "violated § 524(a) by continuing with [a] state court suit" but declining to enter judgment, and in turn sanctions, against the creditor's attorney due to insufficient service of process).

Given the remaining issues and the evidentiary burden of Rountree, the Court shall schedule a pretrial conference for the purpose of establishing a date and time for an evidentiary hearing on the remaining issues.  The evidentiary hearing shall have the limited purpose of deciding whether the Court, pursuant to the aforementioned standards, shall hold Nunnery and Klein in contempt, and, if so, what sanctions are appropriate, if any.

### III.  CONCLUSION

The continuation of the N.C. Fraudulent Transfer Proceeding against Rountree violates the Discharge Order and the injunctive provisions of § 524 of the Bankruptcy Code.  The Discharge Order and the injunctive provisions of § 524 enjoin Nunnery and Klein (i) from continuing the N.C. Fraudulent Transfer Proceeding against Rountree and (ii) from initiating any action against Rountree to collect on the judgment *in personam*.

The continuation of the N.C. Fraudulent Transfer Proceeding against the DeWolfs violates neither the Discharge Order nor the injunctive provisions of § 524.  To the extent the Motion for Summary Judgment seeks injunctive relief against Nunnery and Klein from continuing the N.C. Fraudulent Transfer Proceeding against the DeWolfs, relief shall be denied.

In her Motion for Summary Judgment, Rountree also prays for the Court to hold Nunnery and Klein in contempt for their alleged willful violations of the Discharge Order and the injunctive provisions of § 524; to award sanctions, including an award of damages, against Nunnery and Klein; and to award attorney's fees against Nunnery and Klein.  For the reasons stated herein, the Court declines to grant any such relief at this time.  The Court shall schedule a pretrial conference for the purpose of establishing a date and time for an evidentiary hearing on Rountree's prayer for an order of contempt and for an award of sanctions.

The Court shall enter a separate order pursuant to Federal Rule of Bankruptcy Procedure 9021.

The Clerk shall transmit a copy of this Memorandum Opinion to June Laurie Rountree, the Plaintiff; Steven L. Brown, Esquire, counsel for the Plaintiff; Anthony F. Radd, Esquire, counsel for the Plaintiff; Pamela Nunnery, the Defendant; Paul I. Klein, Esquire, as Defendant and as counsel for Nunnery; John Edwin Bedi, Esquire, counsel for Nunnery and Klein; and

49

Debera F. Conlon, Esquire, Assistant United States Trustee.

Entered this 2nd day of March, 2011, at Norfolk, in the Eastern District of Virginia.

STEPHEN C. ST. JOHN
United States Bankruptcy Judge